| | |
|---|---|
| JOSE ROSARIO, | : |
| Plaintiff | : |
| v. | : No. 2:13-cv-01945 |
| JERRY LYNCH, *#796*; | : |
| GREGORY SANTAMALA, *#935*; | : |
| JOYCE ADAMS, *Warden (PICC)*; | : |
| JOHN DELANEY, | : |
| *Warden (Phila. Detention Ctr.)*; | : |
| RICHI GRACE, *Supervisor (PICC)* | : |
| WILLIAM HILITY, *Internal Affairs Unit,* | : |
| *Philadelphia County Prison Department*; | : |
| CITY OF PHILADELPHIA; | : |
| UNKNOWN CITY OF PHILADELPHIA | : |
| POLICE OFFICERS; | : |
| UNKNOWN CITY OF PHILADELPHIA | : |
| PRISON OFFICIALS; and | : |
| UNKNOWN STATE CORRECTIONAL | : |
| OFFICIALS, | : |
| Defendants | : |

# **O P I N I O N**

Defendants' Motion for Summary Judgment, ECF No. 40 – Granted

**Joseph F. Leeson, Jr.**                                                                          **September 15, 2017**
**United States District Judge**

### I.     Introduction

       Jose Rosario filed this pro se action in 2013, alleging that several law enforcement officials conspired to falsely and maliciously prosecute him for the murder of another inmate. He claims that he was subjected to a battery of torts and constitutional rights violations over the course of his detention and prosecution. Included as defendants are the City of Philadelphia; two City homicide detectives, Jerry Lynch and Gregory Santamala; a Philadelphia Prison Internal Affairs Unit employee; and wardens of the Philadelphia Detention Center and Philadelphia Industrial Correction Center (PICC).

They each have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). Because no reasonable jury could find in Rosario's favor on his claims, summary judgment is granted.

## II. Background[1]

In 2005, Rosario was arrested for two counts of third degree murder. While awaiting trial,[2] he was transferred to the PICC in August of 2006. Approximately two months later, PICC inmate Lance Mears was murdered.

In the time leading up to Mears's murder, other inmates overheard Rosario and Mears engage in a verbal altercation over breakfast. Mears returned to his cell after the exchange, and approximately ten minutes later, was fatally stabbed in the neck. One inmate saw Rosario hide a knife in his waistband, approach Mears's cell, and demand that Mears "step into [Mears's] cell."[3] He watched Mears walk into the cell followed by Rosario and saw Rosario reach into his waistband, pull out the knife, and strike Mears in the shoulder area.[4]

A member of the PICC's Internal Affairs Unit interviewed Mears's cellmate later the same day. He recounted that he was awoken by the incident and witnessed Mears grab his shirt and say "He stabbed me."[5] Mears's cellmate then saw Rosario inside the cell and heard Rosario say to him, "I told your celly about talking to me some type of way."[6] A few days later, at both the request of the Philadelphia Police Department and by order of the Philadelphia District Attorney's Office, Rosario was transferred from the PICC to the Philadelphia Detention Center, where he was placed in maximum-security solitary confinement. He was told that he would continue to be held in administrative segregation until the homicide detectives investigating the case—Lynch and Santamala—decided whether Rosario would be charged for Mears's death, but was released when he "lost a prior case that [he] was fighting."[7]

As part of their investigation, the detectives interviewed an inmate housed at the Philadelphia Detention Center, where Rosario had been transferred after Mears's death. The inmate told the detectives that an inmate currently housed there, whom he knew only as "Dro," admitted to him that he had stabbed an inmate at the PICC. The inmate later identified "Dro" as Rosario.

---

[1] Except as otherwise noted, this background is taken from an earlier opinion addressing various Defendants' motions to dismiss Rosario's claims and is not in dispute. *See Rosario v. Williams*, No. 13-1945, 2014 WL 338114, at *1-2 (E.D. Pa. Jan. 29, 2014); ECF Nos. 24-25.
[2] On March 27, 2007, Rosario was found guilty at trial of the third degree murder charges; and on June 25, 2009, he was sentenced to life imprisonment. Defendants' Statement of Undisputed Material Facts ¶ 1, ECF No. 40-1 and Ex. A, ECF No. 40-2.
[3] Defs.' Stmt. Mat. Facts ¶ 9.
[4] Defs.' Stmt. Mat. Facts ¶¶ 9-10.
[5] Defs.' Stmt. Mat. Facts ¶14.
[6] Defs.' Stmt. Mat. Facts ¶ 15.
[7] Compl. ¶ 22, ECF No. 1; N.T. Tele. Conf. 15:1-5, ECF No. 22.

Based on the accounts from the various inmate witnesses—the two inmates who had overheard Rosario and Mears arguing, the inmate who claimed to have seen Rosario approach Mears while carrying a knife, Mears's cellmate, and the inmate at the Philadelphia Detention Center who claimed that Rosario had confessed to him—Santamala completed an affidavit of probable cause in support of an application for a warrant for Rosario's arrest.[8] An arrest warrant was issued the same day by a judge of the Philadelphia County Court of Common Pleas. On November 15, 2008, Rosario was formally arrested and charged for Mears's murder. In May 2009, Mears's cellmate testified as a witness for the Commonwealth at Rosario's preliminary hearing.

Two assistant district attorneys were assigned to Rosario's prosecution in April 2010.[9] However, prior to trial, Mears's cellmate—who had told the detectives about the comment Rosario made to him after Mears was killed, and then testified to that effect at the preliminary hearing—informed the two assistant district attorneys that he wished to recant his testimony. He attested in an affidavit provided later that he was threatened with prosecution by the District Attorney for Mears's death if he did not testify against Rosario. The affidavit states,

> I, Carl Lansdowne, this day of 04-15-2010[, am] writing an affidavit because I would like to take back the statement I gave on May 5, 2009 in courtroom 306 preliminary hearing in front of the Honorable Judge Patrick F. Dugan [] about the homicide that took place at [PICC] [ ] on Oct. 04. I at no time [saw nor] heard Mr. Rosario [(#852070)] say ["]I told you about talking to me like that.["] I was forced by the District Attorney to testify on Mr. Rosario or I myself would [have] been charged for the murder because I was the victim['s] cellmate. I am coming forward now willingly because I feel messed up about the situation I put that man through[,] and it[']s [eating] me up inside that I would actually be sending a[n] innocent man to jail for a crime [ ] that I didn't see or hear Mr. Rosario speak of on F block at [PICC] [ ]. I am temporarily housed at [State Correctional Institution at] Graterford [ ]. If you would like, Mr. David S. Ludenstein[10] can visit me so I can fix this matter and bring clarification to this situation[.] [Y]ou know where you can reach me [ ].[11]

---

[8] *See* Mot. Summ. J. Ex. B, ECF No. 40-3.

[9] Rosario had also named these two assistant district attorneys as defendants in this case, but his claims against them were dismissed at the pleading stage because they were protected by absolute immunity in their individual capacities. To the extent they were sued in their official capacities, the suit was treated as being levied against the City of Philadelphia itself and the attorneys were dismissed.

[10] Mr. Ludenstein was Lansdowne's attorney at the time. *See* Compl. ¶ 39, ECF No. 1.

[11] Compl. 10.

In March 2011, at the direction of the District Attorney's Office, Rosario was transferred to the Pennsylvania state correctional institution at Graterford and placed in one of the institution's Restricted Housing Units ("RHU") that houses capital case inmates, where he was housed until his trial.

Rosario was acquitted on March 22, 2012. He filed this suit just over a year later, on April 11, 2013, contending that the Defendants conspired to manipulate the prosecution's witnesses and conceal their misconduct. Rosario's suit, claiming a violation of his constitutional rights and of state torts arising from his allegedly false arrest and wrongful prosecution for Mears's death, is based on the affidavit signed by Mears's cellmate, in which the cellmate disavows his original testimony and states that he was threatened by "the District Attorney" with prosecution for Mears's death if he did not go forward with his testimony against Rosario.[12] Rosario alleges that as a result of this conspiracy, he was wrongfully incarcerated for a total of six years,[13] including time in which he was held in solitary confinement at the Philadelphia Detention Center and in the RHU at Graterford, and suffered "serious mental anguish, pain and suffering, and psychological damages" as a result.[14]

### III. Procedural History

Rosario claims that this conduct violated his Eighth Amendment rights and his Fourteenth Amendment due process rights. He does not distinguish among the various Defendants, so, construing his complaint liberally, the Court understands him to claim that each Defendant is liable under each of these claims.[15] He also alleged violations of his Fifth and Fourteenth Amendment equal protection rights, but those claims were dismissed at the pleadings stage for failing to state a claim. *See Rosario*, 2014 WL 338114, at *6 n.9.

In addition, Rosario claims that all of the Defendants committed a number of state torts against him. These include negligence, malicious prosecution, abuse of process, false arrest, false imprisonment, negligent infliction of emotional distress (NIED), intentional infliction of emotional distress (IIED), and civil conspiracy.

---

[12] The Defendants have not disputed this assertion but note that the inmate's affidavit does not state that he was coerced whatsoever by the detectives or the prison's Internal Affairs Unit employee.

[13] Approximately three years and four months, not six years, elapsed between Rosario's arrest for the murder of Mears and his acquittal. But, as previously noted and as will be discussed below, Rosario was already incarcerated on unrelated murder charges when Mears was killed. By the time of Rosario's arrest in November 2008 for stabbing Mears, he had been convicted in the unrelated murder case, and was sentenced to life imprisonment less than eight months later.

[14] Rosario alleges that he was "in and out of administrative segregation due to this case, which totally, you know, traumatized me and affected me in major ways." N.T. Tele. Conf. 15:11-13.

[15] The Court interprets his claims against the City as seeking to impose liability under the principles of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

At the pleadings stage, Rosario's constitutional claims as they pertained to the two wardens were dismissed because the City was also party to the suit. However, the tort claims against them remain. They have moved for summary judgment on each of those claims.

The other Defendants—the two detectives, the Internal Affairs employee, and the City of Philadelphia—have moved for summary judgment on all of Rosario's claims.

## IV.     Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact" and that "the movant is entitled to judgment as a matter of law" such that no reasonable jury could return a verdict for the nonmoving party. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Parties are required to support their respective contentions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). If, as here, the party moving for summary judgment does not bear the burden of proof, it may either "produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the party chooses the latter option, it may not simply make a "conclusory assertion that the nonmoving party has no evidence." *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Brennan, J., dissenting)). Rather, the moving party must "affirmatively show the absence of evidence in the record," which "may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence," or, "[i]f there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record." *Id.*

Rosario has not responded to Defendants' motions, but an uncontested motion for summary judgment may not automatically be granted. *See* Fed. R. Civ. P. 56(e)(3) advisory committee's note to 2010 amendment (stating that even a complete failure to respond to the motion does not warrant default judgment). Instead, the court must ensure that "the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). When, as here, the moving party does not bear the burden of proof, the court must ascertain whether the evidence presented by the moving party, or the deficiencies in the non-moving party's evidence, entitle the moving party to summary judgment. *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (citing *Celotex*, 477 U.S. 317). Properly-supported facts asserted by the moving party may be taken as undisputed. Fed. R. Civ. P. 56(e)(2).

Pro se litigants are entitled to review under a less stringent standard than those represented by a lawyer. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings

drafted by lawyers'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines*, 404 U.S. at 520-21)); *see also Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184 n.1 (3d Cir. 2009) ("[W]e remain mindful of our obligation to construe a pro se litigant's pleadings liberally."). While courts give pro se parties some leeway and make reasonable allowances so that pro se parties do not forfeit their claims because of procedural missteps, pro se litigants must still comply with the same procedures imposed on counseled parties. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) (citing *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir. 2006)). Further, summary judgment requires that all facts must be viewed "in the light most favorable to the non-moving party" if there is a genuine dispute as to the facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Applying these standards, this Court concludes that summary judgment is warranted on all claims.

### V. Summary Judgment is granted in Defendants' favor as to Rosario's Tort Claims against the Individual Defendants.[16] [17] [18]

#### A. Malicious Prosecution

Rosario, believing that Defendants are part and parcel of an alleged conspiracy to prosecute, falsely imprison, and deprive him of his constitutional rights, has alleged that Defendants maliciously prosecuted him. A malicious prosecution claim is sustained only if the plaintiff can demonstrate that the defendant instituted proceedings without probable cause and with malice, and the proceedings terminated in the plaintiff's favor. *Kelley v. Gen. Teamsters, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988). Here, it is clear that the acquittal terminated the prosecution in Rosario's favor, but the existence of probable cause requires further treatment. As discussed below, no reasonable jury could find that the prosecution was not supported by probable cause, so summary judgment is warranted against Rosario.[19]

Probable cause requires that, under the totality of the circumstances, there is a "fair probability" that the person committed the offense. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Courts rely on "the factual and practical considerations of everyday life on which reasonable and prudent men . . . act." *Id.* at 230-31. For a belief to be reasonable under probable cause, it cannot be based on inadequate investigation of the circumstances of the alleged criminal conduct.

---

[16] The Court begins by analyzing the tort claims against the individual Defendants. The tort claims against the City will be analyzed in separate section below.

[17] Rosario has sued the wardens in their official capacities, but suing government actors in their official capacities simply has the effect of stating the claims against the governmental entity (here, the City). *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

[18] The wardens contend that they are immune to these claims pursuant to the doctrine of high public official immunity. But given that no reasonable jury could find in the wardens' favor on any of these claims, there is no need to reach that question.

[19] Because there was sufficient probable cause in this case, the Court declines to analyze the existence, if any, of malice.

*Wainauskis v. Howard Johnson Co.*, 488 A.2d 1117, 1123 (Pa. 1985). Plaintiffs alleging malicious prosecution bear the burden of proving want of probable cause. *Miller v. Pa. R. Co.*, 89 A.2d 809, 811 (Pa. 1952).

  Rosario cannot make out a *prima facie* case merely by proving his arrest and subsequent acquittal, because an acquittal is not alone sufficient to establish want of probable cause. *Id.* at 812. Even in the light most favorable to Rosario, no reasonable jury could conclude, on this record, that there was not probable cause to investigate, charge, and prosecute Rosario for Mears's murder. Detective Santamala's probable cause affidavit identified three inmates who named Rosario as the assailant. Ex. C-2, ECF No. 40-4. The crux of Rosario's argument is that the affidavit from one of those inmates, who claimed that he wished to recant but was threatened with prosecution, is sufficient to make out his malicious prosecution claim. But even assuming that this inmate's account is true, that still leaves the testimony of the two other inmates—the inmate who reportedly saw Rosario go into Mears's cell with a knife and stab Mears in the shoulder area, and the inmate who told the detectives that Rosario confessed the murder to him. Rosario has presented no evidence to undermine those accounts, and calling upon a jury to infer that all of that testimony is unreliable, based solely on the fact that one of the three witnesses recanted and was allegedly threatened with prosecution if he did not adhere to his original testimony, crosses the line from a reasonable inference that a jury could make, to speculation. Thus, even if this Court were to consider the allegedly threatened inmate's testimony as completely tainted by official misconduct, as Rosario contends, there still existed probable cause for his arrest and prosecution in the testimony of the other two witnesses. Further, there is no evidence in the record to suggest that anyone other than the two assistant district attorneys, who are no longer parties to this action, was involved with the alleged threats made against the recanting witness. Notably, the recantation came after Detective Santamala completed his affidavit of probable cause and when Rosario's trial was imminent. By that point in time, the assistant district attorneys were presumably the officials in charge, not the detectives or the Internal Affairs employee. For these reasons, no reasonable jury could conclude that Rosario was maliciously prosecuted by Defendants.

**B. Abuse of Process**

  Rosario alleges that Defendants committed the tort of abuse of process on the theory that they used a legal process against him to accomplish a purpose for which the process was not designed. Compl. ¶ 46. The tort of abuse of process requires that the defendant "(1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998) (internal citation omitted). To sustain such a claim, Rosario must prove that Defendants did not initiate proceedings to prosecute him for the murder because they believed he may have been guilty, but rather for some other reason. He has failed to do so. As stated above in Part A, Defendants had probable cause to believe that Rosario murdered Mears and chose to act upon it and prosecute him. Rosario has failed to allege that legal process was

applied to him for any other reason. The sole piece of evidence upon which he relies, the affidavit of the recanting witness, does not prove that Defendants wanted to prosecute him for any reason other than securing justice for Mears's murder. Taking the affidavit in the light most favorable to Rosario, it suggests that perhaps the district attorneys were concerned that they did not have a strong enough case without this witness's testimony and threatened him to maintain their case. But as mentioned in Part A, even assuming that this is true, it does not undermine the testimony given by the remaining inmates who have not recanted. There is also no evidence that the moving Defendants abused the legal process. Therefore, a reasonable jury could not conclude that Defendants engaged in an abuse of process against Rosario.

Moreover, this claim is barred by the two-year statute of limitations. *See* 42 Pa. Cons. Stat. § 5524. The statute of limitations begins to run on an abuse of process claim when the alleged abuse of process initially occurs. *See Beasley v. Young*, No. 1254, 2012 Phila. Ct. Com. Pl. LEXIS 438, at *6 (Pa. C.P. Dec. 3, 2012). Here, the allegedly abusive process began either on November 15, 2008, when Rosario was formally arrested and charged for Mears's murder, or on April 15, 2010, when the district attorneys failed to withdraw charges after the witness recanted his testimony.[20] The instant action, filed on April 11, 2013, is beyond the two-year statute of limitations.

## C. False Arrest/Imprisonment

As with the abuse of process claim, Rosario's claim for false arrest was filed beyond the two-year statute of limitations and is therefore time-barred. *See* 42 Pa. Cons. Stat. § 5524. In a case where the arrest is followed by criminal proceedings, as here, the statute of limitations "begins to run at the time the claimant becomes detained pursuant to legal process...for example, [when] he is bound over by a magistrate or arraigned on charges" *See Dix v. City of Philadelphia*, No. 15-532, 2015 U.S. Dist. LEXIS 101457, at *14-15 (E.D. Pa. July 31, 2015). Accordingly, the statute of limitations began when Rosario's charges were bound for trial following a preliminary hearing in May 2009, but the instant action was not commenced until almost four years later.

Regardless, while Rosario alleges that Defendants falsely arrested and imprisoned him, he has failed to show that each Defendant was personally involved. Moreover, this claim fails because a prisoner cannot state a cognizable claim of false arrest or false imprisonment while he is already in custody for an unrelated offense. *See Israel v. Superintendent of S.C.I. Fayette*, No. 08-428, 2009 WL 693248, at *13 n.8 (W.D. Pa. Mar. 13, 2009) (citing *McCabe v. City of Phila.*, No. 01–CV–3975, 2002 WL 32341787, at *4 (E.D. Pa. Nov. 13, 2002) ("A plaintiff cannot state a claim for false arrest when he is already in custody."), *aff'd,* 76 F. App'x 464 (3d Cir. 2003)). Because Rosario was in custody for his two third-degree murder convictions at the time he

---

[20] According to the Complaint, Rosario alleges that the district attorney defendants were made aware prior to April 15, 2010, that the witness wished to submit an affidavit recanting his prior statement. Compl. ¶ 39.

claims he was falsely arrested and imprisoned for Mears's murder, he cannot make out cognizable claims of false arrest and false imprisonment.

**D.     IIED**

Rosario's IIED claim against Defendants stems from the entire saga he experienced, but he alleges that his distress became particularly pronounced upon his placement in the RHU at Graterford in March 2011. Compl. ¶ 32. Claims for intentional infliction of emotional distress are also governed by Pennsylvania's two-year statute of limitations. *See* 42 Pa. Cons. Stat. § 5524. "The statute begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Meehan v. Archdiocese of Philadelphia*, 2005 PA Super 91, 870 A. 2d 912, 919 (Pa. Super. 2005) (internal quotations omitted). Because this action was not filed until April 2013, the IIED claim is time-barred.

Regardless, no reasonable jury could find for Rosario on this claim. To sustain an IIED claim under Pennsylvania law, a plaintiff must show that a defendant's conduct was (1) extreme or outrageous; (2) intentional or reckless; and (3) caused severe emotional distress to another. *See Mantua Cmty. Planners v. City of Phila.*, No. CV 12-4799, 2016 WL 3227643, at *10 (E.D. Pa. June 13, 2016). Here, the Court need neither consider whether the Defendants' conduct was intentional or reckless, nor whether it caused Rosario severe emotional distress, because a reasonable jury could not conclude that Defendants' conduct was extreme or outrageous.

What constitutes outrageous conduct is a high bar to clear. Liability will attach only where the conduct complained of "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Cloverleaf Dev., Inc. v. Horizon Fin. F.A.*, 500 A.2d 163, 169 (Pa. Super. Ct. 1985). It is "'reserved by the courts for only the most clearly desperate and ultra extreme conduct.'" *Bryan v. Erie Cty. Office of Children & Youth*, 861 F. Supp. 2d 553, 585 (W.D. Pa. 2012) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)). "The challenged conduct is sufficiently extreme and outrageous when recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 585-86 (quoting *Kazatsky v. King David Mem'l Park*, 527 A.2d 988, 994 (Pa. 1987)) (internal quotations omitted).

Nothing Rosario has alleged in his Complaint, nor any evidence in the record, rises to the level of outrageous conduct. As discussed, there was probable cause for his arrest and subsequent prosecution for Mears's death. Further, as will be discussed herein, Rosario's placement in solitary confinement/administrative segregation while being investigated and then tried for murdering another inmate was neither negligent nor a violation of his constitutional rights because Defendants had a legitimate reason for separating Rosario in order to protect other inmates from him. Finally, considering that the affidavit is Rosario's sole piece of evidence in this case, it is once again noted that the affidavit implicates untoward behavior only by the "District Attorney." Even assuming the assistant district attorneys' alleged threats were

outrageous, they have already been dismissed from this case. Therefore, no reasonable jury could conclude on these facts that any of the moving Defendants' conduct was sufficiently outrageous to sustain the IIED claim.

### E. Negligence and NIED

Rosario's negligence claims are based on much of the same conduct discussed above. More specifically, he alleges that Defendants fabricated and coached a witness to falsely implicate him in an effort to falsely imprison and prosecute him, and also failed to make formal inquiries into his placement in solitary confinement. For the reasons previously stated, Rosario has failed to show the individual Defendants' personal involvement in the alleged wrongs. There is no evidence that any of the moving Defendants fabricated evidence or coached the witness to lie, or were even involved with Rosario's continued prosecution following the affidavit.

Further, no reasonable jury could find that Defendants were negligent by placing Rosario in solitary confinement while he was being investigated and then prosecuted for murdering Mears. To the contrary, Defendants had a duty, if at all, to protect all prisoners against unreasonable risks of harm and failing to house Rosario apart from other inmates immediately after he was accused of murdering another inmate and again following his arrest on these charges[21] may have created an unreasonable risk of harm to those prisoners.[22]

Moreover, these claims are barred by the two-year statute of limitations. *See Aquilino v. Phila. Catholic Archdiocese*, 884 A.2d 1269, 1275 (Pa. Super. Ct. Oct. 4, 2005) (stating that claims of negligence and negligent infliction of emotional distress are governed by a two-year statute of limitations (citing 42 Pa. Cons. Stat. § 5524)). "The general rule is that the statute begins to run from the time the negligent act is done." *Moore v. McComsey*, 459 A.2d 841, 844 (Pa. Super. Ct. May 6, 1983). Rosario was transferred to Graterford in March 2011, such that all of his time in solitary confinement in the Philadelphia Detention Center occurred outside the two-year period of limitations. Because Rosario was placed in the RHU when he was first transferred to Graterford, his claims arising from this segregation also began more than two years before this lawsuit was filed.

---

[21] Rosario testified that he was placed in administrative segregation when the incident first happened, was subsequently released from segregation, and then placed in administrative segregation again, at another prison, after being arrested and that he was held until he was acquitted at trial. N.T. Tele. Conf. 15:1-5.

[22] "A claim for negligence under Pennsylvania law contains four elements: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another." *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005). "A plaintiff advancing a negligent infliction of emotional distress claim must also establish the elements of a negligence claim." *Hernandez v. Palakovich*, No. 1:05-cv-01655, 2017 U.S. Dist. LEXIS 17968, at *35 (M.D. Pa. Feb. 8, 2017).

### F. Civil Conspiracy[23]

Rosario claims that Defendants participated in a civil conspiracy. However, there is no evidence in the record from which a reasonable jury could infer that any of the named Defendants engaged in any kind of conspiracy with the other defendants. At the summary judgment stage, Rosario's allegations are no longer afforded the weight of truth, and he must produce evidence that would create a genuine dispute of material fact. He has not done so. The only evidence he has provided is the recanting inmate's affidavit, and the affidavit implicates only the "District Attorney" as the person who threatened him to testify. From this, a reasonable jury could not conclude that any of the moving Defendants conspired against him. To do so would cross into the realm of impermissible speculation. Further, the alleged threats would have materialized long after the detectives concluded their investigation and relinquished control to the assistant district attorneys. Because there is no evidence that could persuade a reasonable jury to conclude that the moving Defendants participated in a conspiracy to deprive him of his rights, and for the reasons previously stated in granting summary judgment on Rosario's other tort claims, summary judgment for Defendants is warranted on this claim.

### VI. Pennsylvania's Tort Claims Act bars the tort claims against the City.

Rosario has sued the City for the same torts allegedly committed by the other Defendants in this case. The reasons discussed above for granting summary judgment on all of these claims are equally applicable to the City. Additionally, the Pennsylvania Tort Claims Act, 42 Pa. Cons. Stat. § 8542, bars Rosario's tort claims against the City. This Act bars all intentional torts against a municipality and all but eight negligence-based torts, none of which are applicable

---

[23] Rosario alleges that "[i]n an effort to arrest, confine, and imprison [him] . . . Defendants . . . through conspiracy with other(s) [Defendants] and that of a conspiracy of silence, manipulated and coached witnesses, and then with-held [sic] that they had did [sic] so." Compl. ¶ 23. Presumably, Rosario believes the purpose of the alleged civil conspiracy was to imprison and imprison him for a crime he did not commit and deprive him of his rights. Compl. ¶ 32.

There is a two-year statute of limitations on claims of false imprisonment, false arrest, malicious prosecution, and abuse of process. 42 Pa. Cons. Stat. § 5524. "The statute of limitations for a conspiracy is the same as that for the substantive claims underlying the conspiracy." *Simmons v. Poltrone*, No. 96-8659, 1997 U.S. Dist. LEXIS 20512, at *9 (E.D. Pa. Dec. 17, 1997) (citing *Kingston Coal Co. v. Felton Mining Co., Inc.*, 690 A.2d 284, 287 n.1 (Pa. Super. Ct. 1997)). To the extent Rosario's conspiracy claim is grounded on Defendants' allegedly false arrest of him or on their alleged abuse of process, the claim is time-barred for the reasons discussed in Sections V(B) and (C). However, to the extent that Rosario's conspiracy claim is based on his alleged malicious prosecution, the claim is timely because this action was filed within two years of the date the criminal proceedings terminated in his favor, which was with his acquittal on March 22, 2012. *See Sicola v. First Nat. Bank of Altoona*, 170 A.2d 584, 585 (Pa. 1961) (holding that malicious prosecution has a two-year statute of limitations and that claim does not accrue until favor end to prosecution).

here.[24] Consequently, the City cannot be held liable for any of the asserted intentional or negligent torts. *See McDonald-Witherspoon v. City of Phila.*, No. 17-1914, 2017 U.S. Dist. LEXIS 136663, at *26-27 (E.D. Pa. Aug. 25, 2017) (dismissing the plaintiff's "claims against the City of Philadelphia for intentional infliction of emotional distress, false arrest, false imprisonment, malicious prosecution and abuse of process [as] barred because they are intentional torts for which a municipality is immune under the Pennsylvania Tort Claims Act" and finding that the "claims against the City for negligence are also barred as none of the exceptions for certain negligent acts listed in 42 Pa. Cons. Stat. § 8542(b) apply"). Summary judgment is therefore granted in the City's favor as to all tort claims.

### VII. Summary judgment is warranted on Rosario's § 1983 claims against the individual Defendants.[25] [26]

Rosario claims that Defendants violated his Eighth Amendment rights. He alleges that the Defendants, collectively, "unlawfully subjected [him] to the deprivation of freedom by wrongful arrest, incarceration, and trial for crimes he did not commit" Compl. ¶ 76. He alleges that he was subjected to "instances of harassment, pain and suffering, physical distress, psychological disorders . . . imprisonment . . . into solitary-confinement of the worst sort, and thereof placement upon Pennsylvania's death-row" *Id.* ¶ 77.

Rosario also asserts a Fourteenth Amendment due process violation stemming from his placement in solitary confinement and administrative detention pending his trial for Mears's murder. He further alleges that Defendants deprived him of the presence, support, and custody of his minor child. *Id.* ¶¶ 68-69. He contends that his child's mother believed that Rosario was going to die based on his placement on death row. *Id.*

For the reasons that follow, the Court grants summary judgment to the individual Defendants.

### A. Summary judgment is granted on Rosario's Eighth Amendment claim because there is no showing of deliberate indifference.[27]

An inmate claiming that his conditions of confinement constitute cruel and unusual punishment under the Eighth Amendment must show that prison officials were deliberately indifferent to his well-being. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Deliberate indifference

---

[24] These eight exceptions are: vehicle liability; care, custody or control of personal property; real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; and care, custody or control of animals. *See* 42 Pa. Cons. Stat. § 8542(b).

[25] These claims were also made against the wardens, but they were dismissed at the pleadings stage by Judge McLaughlin.

[26] The § 1983 claims against the City are addressed in a separate section below.

[27] Defendants also contend that these claims are time-barred by the two-year statute of limitations for § 1983 actions, *see Wilson v. Garcia,* 471 U.S. 261, 276 (1985), but given that no reasonable jury could find in Rosario's favor on these claims, there is no need to reach that question.

requires a showing of more than mere lack of due care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The deprivation alleged must be "objectively" serious and, in some sense, "result in the denial of 'the minimal civilized measure of life's necessities" *Id.* at 834. Additionally, the prison official must have a "sufficiently culpable state of mind" such that he or she was deliberately indifferent to the inmate's health or safety. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). That is, the official must know of, yet disregard, an excessive risk to the inmate's health or safety. *Farmer*, 511 U.S. at 837.

Rosario's treatment while in custody does not constitute the deliberate indifference necessary to establish a colorable Eighth Amendment claim. Despite Rosario's allegation that he was wrongly incarcerated for "six years,"[28] he would have been imprisoned this entire time regardless of Mears's stabbing due to his unrelated murder case. Further, there is no evidence that Rosario spent six years in administrative segregation or solitary confinement. In fact, he admits that he was "in and out of administrative segregation."[29]

Rosario testified that he was placed in administrative segregation in the Philadelphia Detention Center when the incident first happened and was released from segregation when he "lost a prior case that [he] was fighting."[30] Although there is no evidence regarding the exact dates of Rosario's solitary confinement in the Philadelphia Detention Center, the record establishes that Mears was stabbed on October 4, 2006,[31] and Rosario was convicted on the unrelated murder case less than six months later, on March 27, 2007. The time frame of six months is consistent with Rosario's statement that he "spent six months, almost seven months in the detention center awaiting [charges]."[32] This length of segregation is not sufficient to establish an Eighth Amendment violation and Rosario has not alleged, nor offered any evidence, that any other conditions would show deliberate indifference to his health or safety. *See Ford v. Bd. of Managers of N.J. State Prison*, 407 F.2d 937, 940 (3d Cir. 1969) ("Solitary confinement in and of itself does not violate Eighth Amendment prohibitions."); *Knuckles v. Prasse*, 302 F. Supp. 1036 (E.D. Pa. 1969) (holding that 400 days in administrative segregation did not constitute an Eighth Amendment violation), *aff'd*, 435 F.2d 1255 (3d Cir. 1970). Moreover, the Eighth Amendment claim arising from Rosario's confinement while incarcerated in the Philadelphia Detention Center is barred by the statute of limitations as he was transferred out of the Philadelphia Detention Center more than two years before the instant lawsuit was initiated. *See Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998) ("In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury," which in Pennsylvania is two years. (citing 42 Pa. Cons. Stat. Ann. § 5524)).

He also complains of his placement in the RHU at Graterford when he was transferred in March 2011. He remained in the RHU until he was acquitted at trial approximately one year

---

[28] Compl. ¶ 35.
[29] N.T. Tele. Conf. 15:11-13.
[30] N.T. Tele. Conf. 15:1-5.
[31] Defs.' Stmt. Mat. Facts ¶¶ 4-11.
[32] N.T. Tele. Conf. 16:23-25 – 17:3.

13
091517

later.  However, prisoners may be isolated because they await criminal charges or have not yet been classified. *See Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997). Notably too, Rosario had been convicted of the unrelated murder charges and sentenced to life imprisonment by the time of his transfer to Graterford. Thus, even if Rosario spent one year in the RHU, this alone does not establish a violation of the Eighth Amendment.  *See id.* at 706 (finding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [on him] by a court of law" (internal quotations omitted)); *Knuckles*, 302 F. Supp. 1036; *Paith v. Cty. of Wa.*, No. 06-00806, 2008 WL 2950763, at *6 (W.D. Pa. July 25, 2008) (holding that length of confinement may be one of many relevant factors in assessing cruel and unusual punishment, but it is not dispositive), *aff'd*, 394 F. App'x 858 (3d Cir. 2010).  Rosario testified that the district attorney explained to him that he was placed in the RHU with death row inmates because the prosecutor was seeking the death penalty.[33] Considering this justification for administrative segregation, as well as the prisons' interests in protecting other inmates from Rosario, the Court finds that there is no evidence to support an Eighth Amendment claim. *See Wilson*, 501 U.S. 294 (holding that the constitutionality of confinement depends on the prison's subjective awareness of threats to an inmate's health and safety).

Furthermore, Rosario has not provided any evidence that Defendants were aware of any threats to his health or safety, *see id.*, and his allegations of verbal harassment are not "sufficiently serious" to suggest an Eighth Amendment violation, *see Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006).

Finally, the Court considers Rosario's Eighth Amendment claim in light of perceived malice and caprice associated with his duration in solitary confinement. Consistent with this Court's ruling that there was sufficient probable cause to arrest and prosecute Rosario, there is no evidence that any named Defendant placed Rosario in solitary confinement for malicious reasons. Rather, it was reasonable for Defendants to segregate Rosario while they investigated him for stabbing another inmate, and again after there was probable cause to believe Rosario committed the murder- in order to protect the safety of others in the prison. Consequently, there is no basis for a reasonable jury to conclude that Rosario's confinement was initiated for malicious reasons.

Beyond the duration of his detention in administrative segregation, Rosario has not alleged any indifference to his safety or well-being.  Because there is no evidence from which a jury could conclude that the length of his administrative segregation, alone, violated his Eighth Amendment rights, summary judgment is granted in the Defendants' favor.

---

[33] N.T. Tele. Conf. 14:10-22.

**B. Summary judgment is granted as to Rosario's Fourteenth Amendment claims against the individual Defendants because he has not demonstrated that he was deprived of a protected liberty interest.**

It is not entirely clear from his complaint whether Rosario complains of a deprivation of procedural or substantive due process. Irrespective of the type of due process violation he is claiming, Rosario must first establish, as a threshold matter, that he was deprived of a protectable liberty interest.

Protected liberty interests may originate from the Constitution, state statutes, regulations, or a prison's own rules. *Stephany v. Wagner*, 835 F.2d 497, 499 (3d Cir. 1987). The Due Process Clause does not provide prisoners a liberty interest in staying in the general prison population because "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) ("[T]he Court has not required administrators to conduct a hearing before transferring a prisoner to a bed in a different prison, even if 'life in one prison is much more disagreeable than in another.'" (quoting *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).[34] In *Sandin*, the Court held that unless a prisoner's deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the prisoner is not entitled to any procedural due process protections from the courts. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995). Whether that has occurred in a particular case requires considering both how long a prisoner was segregated from the prison population and whether the conditions of his confinement were significantly more restrictive than those faced by other inmates in solitary confinement. *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000).

Rosario was held in solitary confinement for approximately seven months immediately after Mears's murder[35] and, a few years later, for approximately a one-year period of time. As mentioned previously, however, even detention in solitary confinement for fifteen months does not fall outside of "what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *See Griffin*, 112 F.3d 703, 706-08. Moreover, there is no evidence in the record to suggest that Rosario's detention was in some way atypical or imposed a significant hardship in relation to ordinary prison life. To demonstrate that type of hardship, Rosario must show that the conditions of his solitary confinement were worse

---

[34] That is not to say that no conceivable type of change in prison conditions could infringe a protected liberty interest. The Supreme Court has held that prisoners do have a cognizable liberty interest that could be infringed if they are transferred to a "Supermax" facility, as the conditions of confinement at those facilities are far more restrictive. *See Wilkinson v. Austin*, 545 U.S. 209 (2005).

[35] The Fourteenth Amendment claim regarding Rosario's confinement while incarcerated in the PICC is barred by the two-year statute of limitations. *See Sameric Corp.*, 142 F.3d at 599.

than those imposed on other inmates in solitary confinement. He has not done so and therefore has not established that he had a protected liberty interest.

Rosario has also failed to produce any evidence to suggest that the decision to segregate him was made for discriminatory reasons. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (holding that prison administrators should be given great deference to apply policies that ensure security of the prison). Rather, the timing of the segregation relative to the investigation and charges, as well as Rosario's statement that the district attorney wanted him confined on in the RHU, which houses death row inmates, because he was seeking the death penalty show that Defendants had legitimate, non-discriminatory reasons for placing Rosario in solitary confinement.

To the extent that Rosario contends that being placed into solitary confinement violates his substantive due process rights by subjecting him to pain and suffering,[36] the claim is more appropriately analyzed under the Eighth Amendment, rather than under the generic banner of "due process." *See Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) (holding that the Fourteenth Amendment does not afford greater protection to an inmate than the Eighth Amendment). Because Rosario has not produced evidence that would convince a reasonable jury that his Eighth Amendment rights were violated, as previously discussed, his due process claim on the same grounds would similarly fail.

This Court also considers whether the impact Rosario's placement in solitary confinement had on his relationship with his minor child constitutes a violation of his due process rights- it does not. *See Ford v. Beister*, 657 F. Supp. 607, 608 (M.D. Pa. Apr. 16, 1986). Visitation privileges are a matter within the discretion of prison administrators, *see Hodgin v. Agents of Montgomery County*, 619 F. Supp. 1550, 1553 (E.D. Pa. 1985) (holding that "prison officials have substantial discretion in regulating visiting privileges"), and only an unreasonable or discriminatory denial of a discretionary privilege may amount to denial of a constitutional right, *see Thomas v. Brierley*, 481 F.2d 660, 661 (3d Cir. 1973). Even a blanket prohibition may be an entirely reasonable, nonpunitive response to legitimate security concerns and consistent with the Fourteenth Amendment. *See Block v. Rutherford*, 486 U.S. 576, 588 (1984). Rosario has offered no evidence to suggest that Defendants unreasonably denied visitation privileges with his minor child. Further, to the extent Rosario complains that his child and child's mother may have been scared that he could be sentenced to death in light of his placement in the RHU with death row inmates, the evidence shows that it was the District Attorney's decision, and not that of the moving Defendants, to have Rosario housed in the RHU because he was in fact seeking the death penalty. Regardless, even if the allegations in this regard were true, it would not amount to a violation of Rosario's constitutional rights.

---

[36] *See* Compl. ¶ 36 ("[I] was entitled to due process protection of freedom from arbitrary action which jeopardized [my] physical and emotional well being [sic], in that [I] should not have been subjected to unjustified deprivation . . .").

Summary judgment is granted in individual Defendants' favor on the due process claims.

**VIII. The City of Philadelphia is entitled to summary judgment with regard to alleged § 1983 violations because there was no custom or policy in place that was the proximate cause of Rosario's injuries.**

Rosario avers that the City violated his constitutional rights because of "policys [sic] and practices . . . to pursue wrongful convictions through profoundly and knowingly flawed investigation and prosecution." Compl. ¶ 46. For the reasons previously stated for granting summary judgment in favor of the individual Defendants on Rosario's § 1983 claims, the City is also entitled to summary judgment. Furthermore, under *Monell v. Department of Social Services*, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees and agents." 436 U.S. 658, 694 (1978) (holding that liability for a § 1983 claim cannot be based on respondeat superior). Instead, plaintiffs must show that there was a policy or custom in place and that the policy or custom was the impetus behind the alleged constitutional violation. *See Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

Rosario alleges that an existing custom or policy led to his injuries,[37] but no evidence in the record points toward a City custom—implicit or explicit—of prosecuting individuals known to be innocent. Neither is there evidence of a City policy that endorses coercing prisoners to give false testimony against other prisoners to facilitate fraudulent prosecutions. Finally, there is no evidence of any policy regarding unreasonable or discriminatory placement of prisoners in solitary confinement. Accordingly, no reasonable jury could infer that any City policies were the proximate cause of Rosario's injuries, and summary judgment for the City on the § 1983 claims is granted.

**X. Conclusion**

Rosario has failed to present any evidence that demonstrates a genuine dispute of material fact as to any of his claims. Rather, the evidence is such that no reasonable jury could find in Rosario's favor. Accordingly, summary judgment is entered in all Defendants' favor as to all claims.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[37] He contends that his injuries were "proximately caused by the City['s] policies and practices, utilized in the past as to founded cases of wrongful arrest, though profoundly flawed investigations and prosecutions . . . [and that] these Defendants [sic] . . . maintain[ed] the 'past status quo' of maintaining policys [sic] and practices that . . . were and continued to be the moving force driving the foregoing constitutional violations." Compl. ¶ 93.